Jonathan P. **WOLFF** and Margaret A. Wolff, Petitioners–Appellants,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent– Appellee.**

**Docket No. 97–4273.**

United States Court of Appeals, Second Circuit.

Argued May 20, 1998.

Decided June 30, 1998.

Herbert Stoller, Curtis, Mallet–Prevost, Colt & Mosle, New York City, for Petitioners–Appellants.

Joan I. Oppenheimer, Tax Division, Appellate Section, U.S. Department of Justice, Washington, DC (Loretta C. Argett, and Kenneth L. Green, of counsel) for Respondent–Appellee.

Before: MESKILL, KEARSE, Circuit Judges, and TELESCA, District Judge *.

TELESCA, District Judge:

## INTRODUCTION

Appellants, Jonathan and Margaret Wolff (the "taxpayers"), appeal from a decision of the United States Tax Court, Honorable Steven J. Swift, determining taxpayers' joint income tax liabilities for the years 1979, 1980, and 1981. In a reviewed opinion, fourteen of the fifteen Tax Court judges agreed that certain losses which resulted from the cancellation of forward contracts by Holly Trading Associates ("Holly") should be characterized as capital rather than ordinary losses. Holly was a general partnership in which appellant Jonathan Wolff held an interest. The appellants argue that (1) the Tax Court erred in classifying the losses as capital rather than ordinary; and (2) the appellee, Commissioner of Internal Revenue ("Commissioner"), should be collaterally estopped from re-litigating the same issue, which was decided in favor of the taxpayer by the D.C. Circuit Court of Appeals in *Stoller v. Commissioner*, 994 F.2d 855 (D.C.Cir.1993), *amended by* 3 F.3d 1576 (D.C.Cir.1993)(per curium)[Holding that the same Holly transactions resulted in ordinary losses, in a case involving another Holly general partner].

Because we find that Holly's contract cancellation losses should have been classified as ordinary rather than capital losses, we decline to reach the collateral estoppel issue. The decision of the Tax Court is reversed and the case is remanded for determination of the amount of appellants' tax deficiencies or overpayments for 1979, 1980, and 1981.

## BACKGROUND

Holly Trading Associates was a general partnership organized under the laws of the State of New York for the purpose of buying, selling, trading, and otherwise dealing in commodities and United States government securities, through contracts for the future and forward delivery of those commodities and securities. Appellant Jonathan Wolff ("Wolff") was one of eleven general partners in Holly, all of whom were associated in various capacities with ACLI International Incorporated ("ACLI"), a dealer in physical commodities. ACLI engaged in business as a broker of commodity future contracts through its wholly-owned subsidiary, ACLI Commodity Services, Inc. ("ACS") and as a dealer in government securities through its subsidiary, ACLI Government Securities, Inc. ("AGS").

The Holly partnership was formed to carry out a trading plan developed by Wolff in which he monitored the market for United States Treasury Bonds ("T–Bonds") and Government National Mortgage Association Bonds ("GNMA," commonly referred to as "Ginnie Maes"), and found opportunities to arbitrage T-bond spreads against GNMA spreads. Holly used straddles in both the futures contract market and forward contract trading to carry out this trading plan.

All of Holly's transactions were purchases and sales of either commodities futures contracts through ACS as the broker, or government securities forward contracts through AGS as the dealer. Holly traded contracts, not the underlying commodities or securities. Actual delivery of the underlying securities was never made since the contracts were always closed (via cancellation or offset) prior to the delivery or settlement date.

The government security forward contract straddles utilized by Holly's trading plan were developed to speculate on changes in interest rates. When interest rates made large moves, the change in the value of the entire straddle was buffered by the fact that, as one leg of the straddle increased in value, the other decreased in value by a similar amount. Although the value of any given straddle remained fairly constant, one leg reflected a large loss and the other leg reflected a large gain when interest rates fluctuated widely. When that was the case, Holly would cancel or offset the loss legs and replace them with new contracts for slightly different delivery dates, thereby locking in the unrealized gains.

In order to close an existing contract by offset, Holly entered into a new contract establishing an offsetting position. A contract to buy a commodity on a specified

---

* The Honorable Michael A. Telesca, United States District Court for the Western District of New York, sitting by designation.

future date was offset by a contract to sell that commodity on the same date. Both contracts remained open until the settlement date, when the underlying commodities or securities were deemed to be delivered and accepted.

When a contract is closed by offset, the resulting gain or loss is undisputably classified as a capital gain or loss for tax purposes. However, when a contract is closed by cancellation, the appellants argue that the resulting gain or loss should be classified as an ordinary gain or loss. The Commissioner argues that closure by cancellation should (like closure by offset) result in capital gain or loss.

### Procedural History

The IRS issued notices of deficiency to all of the Holly partners on April 16, 1989 relating to their activities during the tax years 1979, 1980, and 1981. The Holly partners filed petitions for re-determination of the asserted deficiencies. One of the Holly general partners, Herbert Stoller, proceeded to trial before the Tax Court and the remaining partners' cases were held in abeyance pending the outcome of that case.

The Tax Court in the *Stoller* case found that the October 24, 1979 and October 28, 1980 cancellation transactions resulted in capital loss because Holly had immediately entered into replacement contracts for the canceled contracts (i.e. executed "switches"); whereas the November 25, 1980 transaction resulted in an ordinary loss because there was no switch and the entire straddle was terminated. The D.C. Circuit Court of Appeals reversed in part, finding that all three of the cancellation transactions resulted in ordinary losses because they did not involve a "sale or exchange". *Stoller v. Commissioner*, 994 F.2d at 857–858.

Notwithstanding the D.C. Circuit's decision in favor of the taxpayer in *Stoller*, the Commissioner continues to pursue its claims against the other Holly partners, still insisting that the cancellation losses should be classified as capital rather than ordinary losses. By Order dated July 13, 1994, the Tax Court consolidated the cases of two Holly partners, Leon Israel and Jonathan Wolff, for decision on briefs, incorporating the entire *Stoller* trial record into this consolidated case.

The sole issue before the Tax Court was whether the Holly cancellation fees were ordinary or capital losses. Contrary to the D.C. Circuit's decision in *Stoller*, the court below held that the Holly cancellation transactions involved a "sale or exchange" and, therefore, the resulting losses were capital and not ordinary losses. Judge Halpern dissented, disagreeing with what he considered to be the majority's "drastic extension of the doctrine of substance over form." *Estate of Israel v. Commissioner*, 108 T.C. 208, 233, 1997 WL 148537 (1997).

On this appeal, the taxpayers argue that (1) since the cancellations did not involve a "sale or exchange," the Tax Court erred in classifying the losses at issue as capital losses; and (2) the Commissioner should be collaterally estopped from re-litigating the identical issue which was resolved in favor of the taxpayers by the D.C. Circuit Court of Appeals in *Stoller*.

### DISCUSSION

The Internal Revenue Code provides that, in order to incur a capital gain or loss, the taxpayer must have engaged in a "sale or exchange" of a capital asset. 26 U.S.C. § 1222. Closure of a future or forward contract by offset results in a capital gain or loss since a "sale or exchange" occurs when the underlying commodities or securities are "deemed" to be delivered on the settlement date. *Commissioner v. Covington*, 120 F.2d 768 (5th Cir.), *cert. denied* 315 U.S. 822, 62 S.Ct. 912 (1942); *Hoover Co. v. Commissioner*, 72 T.C. 206, 1979 WL 3729 (1979). Furthermore, as the law stands today, a gain or loss from the cancellation of a futures or forward contract would result in capital gain or loss pursuant to Internal Revenue Code § 1234A. However, § 1234A was introduced by the Economic Recovery Tax Act of 1981 and made applicable only to "property acquired or positions established after June 23, 1981...." Pub.L. No. 97–34, § 508(a) (95 Stat. 172, 333) (1981). None of Holly's cancellation losses related to positions established after June 23, 1981. Accordingly, this Court must determine whether Holly's cancellation losses were capital losses or ordi-

nary losses under the law as it existed prior to 1981.

The taxpayers argue that the "vanishing asset" line of cases is consistent with the transactions at issue here. Those cases essentially hold that a gain or loss resulting from a contract cancellation should be treated as ordinary gain or loss because the underlying contract or asset "disappears" when the contract is canceled. Since the asset simply vanishes, there can be no "sale or exchange" and, thus, no capital gain or loss. *See Commissioner v. Starr Bros.*, 204 F.2d 673 (2d Cir.1953); *General Artists Corp. v. Commissioner*, 205 F.2d 360 (2d Cir.1953); *Commissioner v. Pittston Co.*, 252 F.2d 344 (2d Cir.1958).

The Commissioner argues that this case more closely resembles the line of cases which apply the "substance over form" doctrine, holding that a contract cancellation more closely resembles a "sale or exchange" and thus results in capital gain or loss. *See Commissioner v. Ferrer*, 304 F.2d 125 (2d Cir.1962); *Bisbee–Baldwin Corp. v. Tomlinson*, 320 F.2d 929 (5th Cir.1963).

In *Stoller*, the D.C. Circuit distinguished the *Ferrer* "substance over form" line of cases from the Holly contract cancellations by finding that "[h]ere, ... the underlying contracts were cancelled in substance as well as in form. When a contract was cancelled, it did not merely change hands; it ceased to exist altogether." 994 F.2d at 857.

Notwithstanding the D.C. Circuit's earlier holding in *Stoller*, the Tax Court majority in this case found that, since the economic result is the same whether a forward contract is closed by offset or cancellation, the character of the gain or loss to be recognized should be the same. The Tax Court applied the analysis of *Commissioner v. Covington, supra*, (holding that termination of contracts by offset results in capital gain or loss) to contracts which were closed by cancellation rather than offset.

We disagree with the Tax Court's conclusion. As the D.C. Circuit held in *Stoller*, there is at least one important difference in form and substance between closing a contract by offset and closing a contract by cancellation. When a contract is closed by offset, both contracts (the original and the mirror-image offsetting contract) continue to be "open" until the settlement date, at which time the underlying commodities or securities are "deemed to be delivered and accepted" under each contract. *Commissioner v. Covington, supra.* Under the *Covington* analysis, the "sale or exchange" requirement of § 1222 is satisfied on the settlement date, when appropriate credits and debits are made.

By contrast, when a contract is closed by cancellation, it simply ceases to exist and an immediate "cancellation fee" is paid at the date of cancellation. All rights and obligations under the contract are released and extinguished on that date. By applying the *Covington* offset analysis to a contract cancellation, the Tax Court majority would have us impose the legal fiction that, although the contract was canceled, it should nonetheless be treated as if a new offsetting contract was obtained and the two offsetting contracts continued to exist until the settlement date, when delivery of the underlying commodities or securities would be "deemed" to occur. At that point, the "sale or exchange" requirement of § 1222 would be deemed to have been met under the *Covington* analysis. As Judge Halpern noted in his dissent, this theory "is not reality; it is a fiction built upon a fiction," and it is a "drastic extension of the doctrine of substance over form." *Estate of Israel v. Commissioner*, 108 T.C. at 233, 240 (1997)(Halpern, J., dissenting).

We find persuasive Judge Ginsburg's analysis of the same issues in *Stoller v. Commissioner, supra.* Although the economic result achieved by offset or cancellation is identical, both the form and substance of the two closure methods are materially different. The mere fact that Holly selected the cancellation method in order to achieve more favorable tax consequences does not justify imposition of the legal "substance over form" fiction. That doctrine applies when the form of a transaction does not accurately reflect its true substance, which is not the case with respect to the Holly contracts. This Court has long recognized that cancellation or release of a naked contract right for consider-

ation is not a "sale". *See Billy Rose's Diamond Horseshoe, Inc. v. United States,* 448 F.2d 549, 551 (2d Cir.1971).

Furthermore, the legislative history of the Economic Recovery Tax Act of 1981 ("ERTA") supports the taxpayers' position. The 97th Congress amended the Internal Revenue Code by addition of § 1234A specifically to provide that the gain or loss resulting from the cancellation of a contract is a capital gain or loss for tax purposes. The Senate Finance Committee Report on the amendment is informative with respect to the pre-existing law:

*Present Law*

The definition of capital gains and losses in section 1222 requires that there be a "sale or exchange" of a capital asset. Court decisions have interpreted this requirement to mean that when a disposition is not a sale or exchange of a capital asset, for example, a lapse, **cancellation,** or abandonment, the disposition produces ordinary income or loss [ ... *Commissioner v. Pittston,* 252 F.2d 344 (2nd Cir.1958) ... ] This interpretation has been applied even to dispositions which were economically equivalent to a sale or exchange of a capital asset.

*Reasons for the Change*

....Some taxpayers and tax shelter promoters have attempted to exploit court decisions holding that ordinary income or loss results from certain dispositions of property whose sale or exchange would produce capital gain or loss ... The Committee considers this ordinary loss treatment inappropriate if the transaction, such as settlement of a contract to deliver a capital asset, is economically equivalent to a sale or exchange of the contract.

S. Rep. 97–144, 170 (1981)(emphasis supplied). The parties dispute the import of this legislative history. The taxpayers argue that it clearly shows Congress' intent to change the law, implying that prior to the change, the law was in taxpayers' favor. The Commissioner argues that the language represents a clarification that the prior law was

never intended to allow the contract cancellations here to be classified as ordinary losses.

Whether the 97th Congress intended to affect a change in the law or merely clarify it by enacting § 1234A, the Senate Finance Committee at least recognized that authority had developed which supports the taxpayers' position in this case. Prior to the enactment of ERTA, commodity straddles were a well-known tax loophole. *See* Senate Finance Committee Report, S. Rep. 97–144, 145–146 (1981)[Providing a detailed example of a futures straddle tax shelter similar to that at issue here]. The Holly partners were able to exploit this loophole until 1981, when Congress unequivocally closed the loop by enacting 26 U.S.C. § 1234A.

*CONCLUSION*

Because there was no "sale or exchange" when Holly canceled the contracts at issue, the resulting losses should be classified as ordinary rather than capital losses. In light of this conclusion, it is unnecessary to address the appellants' alternative argument regarding collateral estoppel.

The decision of the Tax Court is reversed and the case is remanded for determination of the amount of the appellants' tax deficiencies or overpayments for 1979, 1980, and 1981 consistent with this opinion.